Mr. Taylor, good morning to you, and please proceed. Good morning, Your Honor. May it please the Court. The District Court erred in granting summary judgment of non-infringement in this design patent case, and we suggest that its decision be reversed. The most significant error the Court made in our view is its application of the ordinary observer test. The decision that is affirmed here is a significant change of the protection enjoyed today by the design patent owner. There were two other errors the Court made as well. We believe the Court erred in indirectly weighing and disregarding evidence of confusion of consumers, and we believe the Court erred in its analysis of the points of novelty. I'll talk first about the ordinary observer test because we think, as I said earlier, that's the most important issue in the appeal today, and we think it's the most obvious error the Court made. The ordinary observer test was set out in the Supreme Court when we wanted to be quiet many years ago. In that case, the Supreme Court said it was error to select as the ordinary observer an expert or a skilled practitioner in the field of a particular design issue. Here, the District Court did exactly that. It adopted as the ordinary observer corporate purchasers of triggers products, individuals who are trying to discern small differences in the products they purchase. In essence, those people are experts in the field. Why aren't they purchasers of the product? I'm sorry, Your Honor. Why aren't they purchasers of the product? They are purchasers of the product, Your Honor, but there's a number of purchasers of the product as it moves down the stream of commerce, and we submit selecting the first purchasers. Someone who, the record reflects, may spend as much as a year in making a purchasing decision is falling into the trap that the lower court in Dorham fell into. Now, the lower court in Dorham chose as its ordinary observer similar individuals, people who were involved in the trade, people who were very familiar with, in that case, it was flatware, the design of flatware. And the Supreme Court said that was error. It said the ordinary observer should be the consumer who's buying the flatware at retail. The court said it was not appropriate to choose as the ordinary observer, for example, the purchasers for Tiffany, the purchasers for Parkinson's. It didn't say retail at that point. The Supreme Court in Dorham specifically said, we hold, therefore, if in the eye of an ordinary observer, the definer, given such potential as a purchaser usually gives, two designs are substantially the same, so on and so forth, inducing him to purchase one, supposing it could be the other, the first one patented and claimed by the other. It didn't say so specifically in Dorham. It didn't say whether or not the ordinary observer was the first purchaser or the last purchaser. Well, the ordinary observer that is referred to in Dorham that the court selected as the ordinary observer in that case was the purchaser, for example, from Tiffany's or from department stores or specialty stores. That's who they looked at. The evidence that was presented at the lower court, the patent holder presented evidence from individuals like the corporate purchasers of free prayers here. And those people said, I and people in my situation would discern the differences in these patterns, but the ordinary consumer coming in to buy the product likely would not. The defendants' witnesses in that case all testified uniformly that they believed that the differences were obvious and would be obvious to any person who came in to look. The Supreme Court said it was a mistake to select as your ordinary observer the skilled professionals in the field. The Supreme Court up above the quote that you read made a very clear distinction between experts and ordinary observers, in other words, people who look at this without training and skill that someone in the field bring to it. And in that case, it was the retail consumer that was found to be the ordinary observer. Isn't in the Dorham case the situation that the product never changed? The product was the flatbed. There was nothing added to it, no additional items such as the spray liquid or the bottle that the nozzle goes on, or even the nozzle itself or the trigger. You're only talking about the shroud on top of the spray mechanism, right? That's right, Your Honor. So everything below that is something that's added when it moves down the screen of the counters. Is it not? In general, Your Honor, that's right. But I was mentioning in Dorham what they were talking about was the top of the flatware, not the bowl or the tiny spoon. The design was a portion of a commercial product. But it never changed. Well, the design never changed. And in this case, the design of the shroud never changes. From the point it's manufactured, it is incorporated into the sprayers by my client Kilmar and by the manufacturers who responded. Those are the products that are then invented to other companies that fill a bottle with product and put the sprayer on top. At that point, it probably goes downstream to someone else who handles it, some other middleman-type business, and eventually finds its way to a department store or a drugstore or a grocery store shelf. The consumer purchases it and takes it home. But that shroud has never changed from the moment it leaves Kilmar to the moment it goes home with the consumer and eventually into the trash can which used up. And that shroud, if you think about the use of the product that the consumer buys, the shroud is one of the most visible parts of the packaging. When you hold it in your hand, I think the samples came up, but when you hold that product in your hand, what you see is a shroud. That design has not changed. It's sitting on top of retail product just as the design in Gorham was sitting on the top of the flatware that was at issue there. Let me ask you about Gorham because I'm a little bit confused by your analysis of Gorham. In Gorham, the protected product was this knife or fork or spoon. And as Judge Holdren said, it never changed. And that protected product and only that protected product is what the retail purchaser bought. So when the Supreme Court in its opinion in Gorham is referring to the purchaser, they're talking about the consumer purchaser, as he said, the customer at Tiffany's, not the Tiffany buyer. But here, the purchaser of the protected product is the mass buyer for Procter & Gamble or whoever it might be. So if we put emphasis on the Supreme Court's use in Gorham of the word purchaser and correlate that with purchaser of the protected product, then don't we end up saying the only purchaser of the protected product are the mass buyers for the manufacturers, not the retail consumer at a grocery store or a supermarket? I don't think you do, Your Honor. I think that that product was purchased several times with the most important person. No, but the distinction that you're skipping over is the protected product. Well, the only protected product here is the shroud. The only person who buys just the shroud, like who buys just the fork, in your case, is the mass buyer, not the end consumer. Well, I believe in Gorham, what was protected was not, for example, the entire fork. The design patent only covered the design on the top portion of the fork. So in Gorham, I believe that the patent issue covered a portion of the total product, not the entire product. I'm referring to the Goodyear case, which is a case that was discussed in the briefs. In that case, your design patent covered just the tread pattern. It didn't cover the tire. And yet this court said that the ordinary preservers in Goodyear were truckers and fleet operators who buy tires. And once again, it didn't say that the ordinary preserver was the buyer for national tire wholesalers who buys the tires from Goodyear. It didn't say the ordinary preserver was the manufacturer of trucks who buy tires to put on the trucks. In his opinion, he stressed the idea that the ordinary, forget about ordinary, that ultimate consumer purchaser would look primarily to the tread, at least significantly to the tread in making the purchase. What is the evidence here that the consumers don't look at other things like the label identifying the maker or the size or configuration or color of the bottle or the configuration or arrangement of the trigger or the nozzle, but they look mainly to the shape of just the shrapnel? Your Honor, I think consumers do look at all those things in making the purchase. And we don't have evidence in the record that they look mainly at the shroud, but I submit that the law doesn't require that. Well, the keystone decision on which you want to rely seemed to have as its linchpin the idea that the tread was preeminently important to the ultimate purchaser. And if the shroud alone isn't preeminently important to the ultimate purchaser, then it seems like the keystone should not apply here. Well, the point I was making in the Goodyear case, Your Honor, is that the tread was only a portion of the consumer product, and yet the ordinary preserver who was selected there was the ultimate consumer purchaser of that consumer product. My reason was that the tread was preeminently important in the Goodyear case, but I'm only pointing to these two. And in the Goodyear case, there was nothing added down the stream of confidence. The tread is manufactured and is bought by the consumer for exactly the same. Well, I mean, what was added was the rest of the tire. The tread, the patent covered the tread, and the tread is incorporated into a larger product, which is the tire. The tread is the indentations in the edge of the round part of the tire. Right. But to come back to your question, Your Honor, the law doesn't require that the design patent be the important focus of consumer attention. I don't think you find that really in any of the cases on design patent infringement. What the law requires is that the ordinary observer is likely to be deceived by similarity between the accused and the… But if the ordinary observer, the retail purchaser, doesn't even pay any attention to the shroud, then how can he be deceived about the origin or quality of the product based on similarity of one shroud versus another? Well, we have evidence in the record. We have three fact witnesses and an expert witness who now have testimony in the record that the consumer would be deceived by the accused shroud. They would believe it was the same as the patent shroud. So there's evidence in the record indicating that there would be deception. Unfortunately, the judge did not credit that evidence at all because he concluded the ordinary observer was the essentially expert corporate buyer. And we submit that that was another error. On summary judgment, that evidence should have been credited to Kalmar and all reasonable inferences drawn from it. What's the foundation of the evidence? Is it expert testimony? One piece of testimony was expert. The other three pieces… Well, let's go one piece at a time. What was the foundation shown in the deposition of the opinion drawn as an inference from that foundation by that expert? Actually, it wasn't a deposition. It was a declaration that the expert put in. And the foundation expert had worked for ten years for Procter & Gamble in the group that was responsible for their sprayer products. My questioning is expertise. I'm questioning whether there was a stated foundation in the declaration that could serve as the basis of the ultimate opinion drawn by that expert. Well, the foundation was his summary of how a consumer makes a purchasing decision and the importance of packaging in that decision. And his expert opinion that the shape and nature of the shroud is taken into account by consumers. That's the foundation. What's his foundation for saying that? His experience in the field. I don't understand that that's an answer. Well, he had attached to his declaration probably a hundred pages of studies about marketing, packaging these products, consumer perceptions and consumer reactions to various packaging innovations. And so that's the factual and experience foundation from which he drew the conclusion that the consumer would be deceived, would likely be deceived by the Acuna Shroud. It was based on his expertise in the field. And his expertise taken together with consumer studies and consumer information, he attached to his declaration. So you're suggesting that the attachments form the foundation of the expert conclusion that he ran. That's right. And then there was a second? There were three fact witnesses. They were… One expert and three fact witnesses? Yes, Your Honor. And the three fact witnesses were Kalmar officials who said that in their experience in the field, that they believed that consumers would likely be deceived by the simple Arachnid Shrouds. And again, that came from one of those… How is that fact tested? Why isn't that opinion testimony without the rigor of the expert witness federal rule of evidence? Well, it's not a fact known to them personally. They aren't the ordinary consumer. No, but they are not the ordinary consumer. But they, for example, the first man was the vice president in charge of sales. And his job is to deal with selling these products. And they visit with their customers like crop and gamble. But even on down the line to the… Let's take the example of grocery stores, the wholesale lines for stores. And even down there is evidence in the record of a manager of a local grocery store. And so as part of his job, he's in touch with the customer chain all the way down to the people that sell to the consumer. Yeah, but not the consumer. If he was out there interviewing 2,000 consumers, then he could say as a matter of his own knowledge, I know what the consumers think when they look at these things on the shelf because I interviewed 2,000 consumers. But I don't understand that he said anything of that sort. He did not, Your Honor. But let me respond in another way by saying this court has held in the past that evidence of actual consumer computing is not required. We don't have to have a survey showing consumer deception. We have to have some evidence showing consumer something. Maybe not confusion, but consumer something. And I'm not clear on how to witness the company witnesses to whom you're referring related anything about consumer perception as fact witnesses. Well, once again, it was based upon their experiences in working with their customers down the supply chain. They did not name the individual consumer who'd been deceived. But let me answer that perhaps in an indirect way. What are they saying? That when I talk to downstream people and purchasers for giant grocery stores, they tell me that consumers would be deceived. And that's why I know consumers would be deceived. The store buyers tell me consumers would be deceived. Let me give you an example. Kalmar's vice president in charge of sales said that a consumer wouldn't be able to tell the difference between the accused shroud and the patent. I'm saying the testimony, if I'm trying to understand whether it's fact testimony. It is testimony that is based on their work out in the field and conclusions they've drawn from their jobs in making and selling product. It's testimony extracted from the depositions. The testimony does not give any specific examples of a particular consumer who was deceived. Does it reveal that the witness ever interviewed any consumer? Yes. I think the record indicates that they talked. In fact, the thing that triggered this whole lawsuit was a Kalmar official talking to a grocery store manager about some of the accused product, where it came from, about why it looks so similar. So there we certainly have some evidence. That's not my question. My question is does this witness indicate that he ever talked to any purchaser? He does not name a specific example. I understand he doesn't name them, but does he say he talked to 50 or 100 or 600 or 4,000? I think he says that part of his job is doing that. But again, that was not the focus of the deposition. That was not a topic that was explored in great detail. But the point that you want him credited on is that dumb me, when I go to the grocery store, would be confused. And I'm trying to figure out how would that witness know whether I would be confused? Me, the dumb, ordinary consumer. If he hasn't interviewed me or a bunch of people like me, does he only deal with people higher on the distribution chain? Well, Your Honor, he would know that from perhaps dealing with people higher on the distribution chain. But I'm not suggesting to you that he's never talked to consumers. I think he either has talked to consumers or he's been – That's not the question. The question is where in his declaration does he say he talked to consumers? And therefore knows what confuses or deceives or influences consumers. It's a deposition, not a declaration. And he doesn't say that specifically. He just states that he believes consumers would be deceived by the similarity of products. That's his opinion. Isn't that just his opinion? It is his opinion, Your Honor. You called him a fact witness. Well, he would be a fact witness. And the problem is we're necessarily – What is the fact that he's testifying? What company buyers told him? Yeah, as to the lack of their dissension. Again, we're in a summary judgment motion context here. We are not weighing evidence off of the trial. This isn't a credibility question. This isn't a question for the judge had the right to make these determinations. The issue is fact discovery was not even complete in this case. Expert discovery is not going to do that. Isn't it normally a requirement of evidence proffered to defeat summary judgment that it would have to be admissible? It is, Your Honor. Now, how would this be admissible if it's like quadruple hearsay? It might not be, Your Honor. It might not be admissible that way. But the point I'm trying to make is at trial, this man might be given the opportunity to introduce admissible evidence. It's about specific conversations with specific people he heard. We never got that point. The case was dismissed on a summary judgment before we got there. This court itself has held, has created a trial issue. All you need is the accused product and the design and a comparison. That should have been enough to get this case in the court and eventually to go to a jury, given the similarity of those products. My guess is if we disagree with you that the purchasers should include the retail customers, do you then lose or do you win anyway, even with the expert purchasers? I believe we win anyway, Your Honor. Then tell us about the fallback argument of how you win anyway, even if only the experts are ordinary purchasers. If only the experts are ordinary purchasers, we lose. I don't think there's any evidence in the record that would indicate an expert buyer. So this whole case then turns, in your view, on the correct definition of who the ordinary observer is or isn't. Yes and no, Your Honor. What the court said was that the ordinary observer was corporate buyers of triggers and records. What the court did was limit that to the expert buyers in his decision. There's evidence in the record that other corporate buyers, other than the large, multi-national, sophisticated buyers, would likely be deceived by these products. They were called the B- and the C-level buyers by some of the witnesses. And we submit that even if you conclude that in this case the proper ordinary observer is a corporate purchaser of trigger sprayers, that that universe should not be limited to the top end of my client's customers. Is it your view that the judge limited it to the A-list buyers? I didn't understand that. I thought he treated all the corporate buyers as the class, not the ultimate consumer, me in the grocery store, but all of the corporate buyers as the ordinary observer. Well, no, Your Honor, you're right. He said that, but then he did not credit testimony which indicated that there was a likelihood of deception among the less sophisticated corporate buyers. Well, when I look at that testimony, it's hard for me to figure out what the foundation of it is. The witnesses say the B- and C-list buyers would be confused, but there's no explanation of why they would be any more confused than the A-list buyers. What difference does it make whether I'm buying 100,000 shrouds or a million shrouds? If I'm a corporate buyer, I would assume I'm going to be real careful in either event. I think the evidence indicates that that's certainly true with the A-list buyers, but that is not necessarily true with the less sophisticated buyers. In fact, that's why they're called less sophisticated. The testimony was, but I'm trying to find out if the testimony had any basis to it. Well, the testimony came from a discussion of the different levels of customers of CalMart, and there was direct testimony from people who deal with those customers, and those witnesses said this level of customer – I remember one party says it's a little sketchy how they operate. And in another place, they said that the fellow that markets with these customers said the B- and C-level customers likely would be deceived. Now, what's the foundation of that? Again, he deals with those people directly, and he understands how they do business, how they make their purchasing decisions. And they're not taking – Is he considered this person who talked to the B- and C-people a fact witness? Well, he's providing – his testimony provides his view of the fact that those corporate purchasers were likely to be deceived. And that's – we're dealing – the likelihood of deception is a fact issue. Well, correct, but doesn't that go back to Judge Michel's comment that isn't really based on hearsay? He talked to other people, and other people told him. Well, I don't think it's hearsay because it's based on his own personal experience in dealing with those people. But it's what those people felt, what those people understood. It's their statement. Well, what his statement was is he believed they would be confused by the similarities here. How would he know that? Again, based on his experience in dealing with them. It doesn't tell me anything to say based on his experience. What did he see or hear or do that showed him that they were confused? What he has heard and what he has seen is how they approach the process of buying or purchase products, how much care they show in the purchase. For example, a property gamble buyer may take a year to buy something. The less sophisticated purchaser may buy something after a one-hour, two-hour, three-hour, or one-day type of consideration. That's what his experience is talking about. There's just much less care taken in the purchasing decision. And because of that, and because of the similarity in the products, there's a much greater likelihood of deception at that level. So we submit that even if the purchaser is the ordinary observer, there's evidence in the record indicating that that observer would likely be confused. So at least warrant a trial. That's your agreement. That's right. We should at least be able to go to trial on that. Anything further? Oh, I will say there's not time until if we're talking on time. If there isn't any, but we'll just do it. Oh, I'm sorry. Good morning, Your Honor. May I please report? I'd like to start out, if I may, with the point that was just left by the court. And that was specifically relating to the evidence suggesting where CalMAR suggests that there was evidence that the B&C buyers might be confused and that the district court disregarded that evidence. The evidence that CalMAR cites to us on page 23 of the brief specifically relates to a statement of CalMAR's vice president, a gentleman by the name of Anthony Marotte, who said, quote, that the B&C customers would not appreciate the differences in design on initial inspection. I would submit that that statement, that even if it were admissible, even if it were based on some type of foundation, which there's no indication that it is, and incidentally we objected to this in court, objected to this evidence in court below, that that statement is equivocal and doesn't address the applicable standard of design practice. There's also another reference on page 23 of CalMAR's brief referring to a former employee of CalMAR, a gentleman by the name of Mr. Rodden. His testimony was related to the smaller, these B&C type customers, that they are not sophisticated and potentially could be poor, potentially could be poor. I'm sorry, I'm on page 23. If you are as well, maybe you can help me out. He's got the brief. Oh, I'm sorry, the reply brief. Oh, thank you. Okay. The reply brief of CalMAR. And the second statement was that CalMAR's smaller customers are not sophisticated and potentially could be poor. I would again submit that a third-party witness testifying that customers potentially could be poor doesn't come anywhere near the standard that was articulated in Gorham. I'll also note that we objected to that testimony at the court below because there was evidence in the record that Mr. Rodden had not even been in the industry for the past 10 years. He didn't have the foundation to talk about customers currently. Your Honor, it's just that the focus of the comments were mostly related to the ordinary observer. I'll start with those comments as well. Before you go away from the B and C customers, was there any other testimony regarding the level of care exercised by the B and C corporate customers as opposed to the A corporate customers? There was a significant amount of evidence that was developed to the deposition of primarily CalMAR's employees, the President, Mr. McKernan, Mr. Maroque, and another gentleman by the name of Mr. Saprinsky. So now you need to rebut all three of the testimonies, not only Maroque, which you have done in recipients. We set forth in the record in our briefs, Your Honor, the testimony by those witnesses, and they all testified about the relative level of sophistication of the buying process. In addition, I'll note the expert that was advanced by CalMAR at the summary judgment stage also said that in his opinion there would be no confusion. I think the language he used was it would be a significant exception to find professional buyers to be confused. I thought he was referring to the A as corporate buyers. He doesn't use a gradation. He just refers to corporate trade buyers. He doesn't say A, B, or C or put any kind of levels on it in his testimony. I'll also note specifically related to Mr. Dehoff, who was the expert that they advanced in picking up on the Court's comments about foundation. First of all, he identified himself as an engineer. He was a buyer. He was not a consumer perception expert. There was no evidence submitted in this case of any consumer surveys of any consumer perception whatsoever. As a matter of fact, if you go through the materials that were submitted by Mr. Dehoff as his foundation, none of it is related to the shroud. It's related to more general studies related to consumers' view towards packaging and the greater product. I think Judge Carney at the district court level made a point of going through all that evidence and indicating what the flaws were with it and why it didn't in any way reflect confusion. Specifically related to the ordinary observer, Your Honor, Kalmar tries to pigeonhole this case as being the expert as the ordinary observer. That is not what the district court said. That's not what Gorham requires. And that's not what the evidence shows. There is nothing in the case law, Goodyear, Keystone, Gorham, which are the three primary finding precedents on this Court, there's nothing in the case law that says an ordinary observer can't be sophisticated. Certainly an ordinary observer can be more sophisticated than, for example, a retail consumer. This Court addressed that issue specifically in Goodyear, when at the district court level in Goodyear, the patentee complained that the district court had applied the ordinary observer of a truck tire or a fleet tire. And the patentee said, well, that's too sophisticated of a buyer. We really should have any purchaser of a tire. And this Court said, well, no, the evidence indicates that the buyers of the tires are trade buyers. They're fleet buyers rather than truck buyers. So this Court has specifically addressed that issue. With regards to the issue about the flatware in Gorham and the tread with the tire, the best explanation that I can offer is actually the analogy that the district court offered. And that is simply that a shroud is to a trigger sprayer as a tread is to a tire, or as the design of flatware is to the utensil itself. The fact is that there was no evidence in either Gorham or in Goodyear that, for example, in Goodyear, that the tread is sold separately from the tire. It's all part of the same transaction to sell the tire. The same with flatware. When you sell, there's no such thing as selling the design of the flatware separate from the flatware itself. It's one item. And so you evaluate who is the purchaser of that particular item. The facts are in this case, and it's undisputed, that we have two separate types of buyers. We have buyers who buy the trigger sprayer, which the shroud is incorporated, and we have evidence that never do retail consumers ever purchase trigger sprayer shrouds. They're 100 percent of the time purchased by trade buyers. The consumers buy the brand new product, the bottle, the Windex, the cleaning fluid of which the trigger sprayer is just a small component. This Court addressed that exact issue in Keystone. When this Court disregarded the evidence that was advanced by the patentee in that case, that members of the trade show who had been viewing the retaining wall Let me back up a second. Keystone was about interlocking blocks in a retaining wall, and that that was the patented item. The evidence that was submitted by the patentee in that case were the folks at a trade show who saw the completed retaining wall. The blocks were part of the retaining wall. And this Court said, well, we're not going to consider the evidence of the confusion that was submitted by the patentee regarding to the viewers of the wall, because they're not the buyers. They're not the ordinary observers of the block. It's the purchasers of the block in that instance. So this Court has addressed that exact issue. I also think it would be important for me to address the policy statement that Kalmar makes. They make a grand policy statement that following the Goodyear precedent and Gorham, would necessarily gut design patents for all of the design patent holders of component parts. I would submit that that's not the case at all. Patents are defined, what Kalmar really is advocating for is a gross expansion of the patent laws beyond the meets and bounds of the patent itself into factors that have nothing to do with patents, like consumer perception of a product that incorporates a component. Once, Your Honor, do you believe that once the Court... Let me ask you this. Remind me whether Goodyear or Keystone turned on the issue of trial versus summary judgment. Or were they on the merits? Goodyear, I believe, was a trial, Your Honor. That's what I thought. I believe Keystone was... It's not exactly analogous to the issue here, which is simply whether he gets a trial. Who would win at the trial? None of our business. Keystone, I believe, was a summary judgment motion, Your Honor. The fact is that the issue of trial or summary judgment, I think, is... The issue is were there any facts submitted at the summary judgment stage to create a genuine issue of trial. I think that's the issue. And the record is devoid of any evidence to suggest that any trade lawyer would be confused. There are also, Your Honor, I would submit absolutely no evidence that any consumer, retail consumer, would be confused as well. But I don't think we need to get to that point because I think the ordinary observer is clearly the trade lawyer. I'm confused about confusion. There's a lot of talk in the case hall, and there's been some talk in the courtroom this morning, about whether confusion is a requirement or not in the context of design patent infringement cases. Can you help me with that? Yes, I can, Your Honor. It is true that evidence of actual confusion is not a requirement to establish a likelihood of deception. However, that is certainly a piece of evidence that you can bring forward. Traditionally, when you don't have evidence of actual confusion, the way you would submit it is through survey evidence or some other type of circumstantial evidence that would establish there would be a likelihood of deception. There was no evidence of any of that type in here. But what would you consider to be the difference between deception and confusion? Are we essentially blurring over into the trade dress issue as a confusion type of analysis? I think what we have to apply, Your Honor, is the Gorham Standard, which is that one buyer would buy one believing it to be the other. Whether the court's deception, I would not disagree with that, Your Honor. I believe I've seen cases that have applied it as both confusion and deception. I think we need to be guided by the Gorham Standard. It just means we're one buyer thinking it to be the other. Help me with the pronoun. You would say we're one buyer thinking it to be the other. Are we talking about the full product with the fluid and the bottle and the whole business, or are we just talking about this? No, Your Honor, we're just talking about that. We're talking about the patented item. And Gorham makes that clear, and Goodyear makes that clear, and Keystone makes that clear. Here's where I have a problem. This is what the parties make, right? Correct. They don't make the whole product with the bottle and the fluid. They just make this. Yes, Your Honor. Part of this is the subject of a design patent, the part right here. The rest of it is not protected by a design patent. Yes, Your Honor. So this already is a product that's more than just the protected product. Yes, Your Honor. We're already past Gorham. It is like the tread. It is like a tire to a tread, and it is like flatware to the designer flatware. That was the analogy that Judge Cardi used at the district court level. Oh, everything below the shroud would be the fork or the knife, the actual utensil that you use. Below the flatware. The way I understand the analogy, Your Honor, is that a trigger sprayer is not to a bottle like a tread is to a tire. It is the shroud, the plastic covering, which is the only thing that's protected by the patent, is to the entire trigger sprayer as a tread is to a tire because you don't sell the shell, that plastic patented shell, separate and apart from the trigger sprayer mechanism. Aren't you selling it in conjunction with the bottle and you have to put it on something and spray the liquid up? No, Your Honor. The evidence actually is the contrary, and that is that the trade buyers, the Procter & Gamble, not just Procter & Gamble but what they call contract fillers, that they actually buy that component, the trigger sprayer, and then assemble it with bottles and liquids at some later point. So there are separate transactions that go into compiling the final consumable product that goes to the grocery store. If the consumer purchases the final consumable product, the consumer never purchases the component which holds the design patent. No, there's no evidence to the effect that the consumer would be confused by using one sprayer over another. There's no evidence in the record at all on that. So with regard to what Judge Mischella indicated, confusion or deception, going back to the Gorham test, Gorham talks about deception. But is it deception at the ultimate consumer level in which the buyer buys the entire product off the shelf, like they would be buying a completed fork or knife or otherwise with the design on the handle, or is it confusion to the buyer at that level of the sprayer? It has to be confusion or deception as to the buyer of the patented item. Are we using those two terms interchangeably? I did in that instance, Your Honor. If we talk about deception, I think it's the same analysis, which is you examine deception from the perspective of the buyer of the patented item. Goodyear makes that clear and Keystone makes that clear, and Gorham, I believe, also makes that clear, not in the same express way that Goodyear and Keystone do. But this Court has ruled, I believe, on that specific issue. It probably most clearly in Goodyear where it says it has to be the item that is the patented item. Let's assume you persuade us that it has to be the item. The figure sprayer is the shroud, not the bottle of the fluid in the final product. How do you apply the test? Do you ask whether somebody would be confused comparing the two side by side, or do you ask whether if the buyer saw this one week and then a week later was shown this, then he might think he was seeing the same thing? Which way do you do it? I would apply the Contessa standard, Your Honor. This Court's ruling in Contessa indicated that the analysis is a hypothetical objective analysis where you first have to construe the claims. And it's a bit of a misnomer to talk about this in the real-world scenario because in the real world you don't have claim construction. This is not a trade dress case where claim construction is not an issue. This is a design patent case where first you have to construe the claims. And it's a hypothetical objective analysis. After the fact finder is provided with the construction of the claims, the fact finder is then provided with the information about who the ordinary observer is, then the fact finder would apply that standard to comparing the two items. And relating to the claim construction, as Judge Carney went through, the claim construction here is so narrow, the artist is so crowded, as Calamari even acknowledged in their opening brief, that if the claim construction is given previous, there can be no finding other than infringement. So my answer to that, Judge Michelle, is that I believe you have to be guided by Contessa, which says that you have to examine each view of the patent and each view of the corresponding accused device in light of the claim construction and make an objective finding as to whether or not there's likely that one would purchase it, leaving it to be the other. I believe my time is up, unless Your Honor has any questions or would like me to address any other points. Thank you. Mr. Taylor. Thank you, Your Honor. Following on from that thought, in Contessa, this court held that infringement should be judged for the entire lack of the product, the manufacturer, and the disposal. If you apply that test here, most of the lack of this product, it's going to be in the sight of the consumer. The purchaser buys it off the grocery store shelf and takes it home and uses it. So if you're going to be looking for infringement, what is the fault of the lack of the product? That's right. So are we comparing the plain shroud with what has been used? You're saying that you're going to be comparing the bottle to the ultimate consumer that buys the bottle off the shelf rather than the buyer who buys under the shrouds? No, sir. I'm suggesting you compare the shrouds, the accused shroud against the patent, through the course of the accused product's life. And the majority of that product's life is when it's in the hands of the consumer. And I think that in order to make that infringement analysis, the ordinary observer has to be the consumer and not the first buyer in the chain of commerce. Going back to Gorham, you know, Gorham did not look for deception among the buyers for Tiffany. Gorham looked for deception among the buyers from Tiffany, the consumers. There's nothing in the law that says you should look to the first purchaser as the ordinary observer. And there's a lot in the law that say if you look at the consumer of the product, the ordinary person is the ordinary observer. What's the product? The whole bottle? The ray or just the trigger sprayer mechanism? Well, the patented product is the shroud, Your Honor, but as you pointed out, it's already a part of a larger assembly when it's first sold. And I don't think that changes the nature of the shroud. No, that's not true, though, because they sell the shrouds independently of the bottle. I don't think that's right, Your Honor. I think the shroud is always attached. Well, they sell trigger sprayers, but not just the shroud. The shrouds are just the very top plastic part that covers the pumping mechanism, and it's attached to the sprayer mechanism before it's first sold. So the first sale that occurs, the shroud is part of a larger product, and it is then unchanged through the rest of its life. What happens is the screw top is screwed onto a bottle, and then it's then dealt to the consumer. But the actual patented product, which is the shroud, is attached and sold through a chain of commerce. And it's, I mean, to just step back for a moment, the whole purpose of this is to sell products to the consumer. The reason Mr. DiCarlo's client is making such a similar product is to sell products to a consumer. If the consumers didn't care about this, he'd make a round shroud. They wouldn't spend hundreds of thousands of dollars litigating this case. I mean, the fact that we're here, and the fact that this is the second go-around on the infringement litigation about the shroud design tells you it is important to the consumer. The whole point of this business is the end consumer who buys the product. But then how does that square with your point that we have to look at it throughout the lifetime of the product? It seems like the moment of purchase by the consumer is the magic moment under your own analysis. Well, that is the magic moment in terms of the whole chain of commerce. In other words, all the work that Cal-Mar does in its design and all the work that it does with Procter & Gamble and packaged products is directed toward that moment of purchase in the store when a consumer buys it. That's the important purchase, and that's where the deception is important. The design patent should protect the patent owner against deception of the consumer. Tell me in one simple sentence. I haven't understood this since I started working on this case. If I'm the consumer, exactly what am I deceived about if one shroud is similar in appearance to another? Well, again, if you go back in the record, in our expert's declaration, he had a package to it. I'll try to summarize it for you quickly. The goal of a generic manufacturer is to make a product that is as similar as possible to a main brand product. And so in coming down to what the consumer is deceived about it, the consumer can see that shroud and say, that's the very same sprayer that's on Windex, and I know it works great. So this will work great too, because it's the same thing. That's the kind of deception that in the end, I think, would be a concern here at the consumer level, is that the consumer will view the actual product... I'm confused. I'm trying to imagine being the consumer. I'm in a supermarket. I'm going to buy some window cleaner and a spray bottle, and I used to use Windex, and I think it worked great. So I go to the shelf, and let's say there are ten alternative products there. One of them has a big label that says Windex, and the other nine say some other maker. Is it the simple answer that I'm going to buy Windex if I want to get Windex quality to comport with my prior happy experience with a Windex product, and I'm not going to pay any attention to the shroud? Well, I mean, some customers will do that. They will buy the name brand, but the whole underlying idea of the generic brand marketing is to try to make the product look and have the same appeal to the customer as the name brand product. You're talking there about trade dress. You're talking about trade dress. That's what private labelers try to do. They try to get as close as possible to the brand, the product. That's right. But that's trade dress. Do they really overlap in the two, as I've stated before? Well, yes, Your Honor, I agree with you. I'm not talking about consumer confusion, because that is a trademark trade dress issue, and I don't mean to mix the two together here. I was responding to the judge's question about how does the confusion or deception occur at the consumer level, and it occurs because of the substantial similarity of the accused's design to the patented design. When the consumer or the person... What is the evidence that the ordinary consumer in a grocery store is not going to look at the bottle shape, not going to look at the color of the fluid, not going to look at the name of the maker on the label, but is going to depend on the shape of the shroud to decide which product he's going to buy, because he remembers that a product he bought three months ago had a similar shroud, and he liked that product. Your Honor, I'm not suggesting that the shroud is going to cause the consumer to buy a generic product rather than a money-grant product. What I'm suggesting... Then what's the deception? Who's being deceived into what? Well, there's a likelihood of deception at the consumer level what calls for the substantial similarity of the products. That's what the legal test is. All the products... But I'm not buying the trigger mechanism. I'm buying the whole product with the fluid and the bottle and the label and the trigger mechanism. So unless you have some testimony that the ordinary consumer uses the shroud shape as a proxy for who the maker is or what the level of quality is, I don't see what the risk of anybody being deceived would be. Can I respond to that about the testimony? It comes back to your earlier question about was there any testimony of actual consumer confusion. And I agree with Mr. Picardo. There's no requirement of evidence of actual consumer confusion. Shouldn't there have to be some testimony that there's good reason to believe that consumers pick the product based on the shroud shape as distinct from all the other earmarks of the total product, like the bottle shape, the bottle size, the color of the fluid, the name on the label, et cetera? I don't believe there is, Your Honor. What there needs to be is testimony of likely deception of the ordinary observer. That's what the test is. But if you want the consumer to be the ordinary observer, don't you need evidence of that to be deceived? Well, we have testimony, as I mentioned in my first time up, from four different witnesses that they believed that the consumer was likely to be deceived. Let me suggest if you go back to the Gorham case, that's exactly the kind of testimony the Supreme Court credited. It was testimony from men who were buyers or designers or otherwise skilled in the field about their view that the ordinary consumer, the purchaser, wouldn't be deceived by the similarities. It was exactly the same kind of testimony that we have on the record here. And we submit that that testimony should have been credited and all reasonable evidence was drawn from it at this level of the case, again, at the summary judgment motion level. I think we have both sides of the positions well in line from the careful evidence. We'll take the case under review. I just want to thank you both. Thank you very much.